Filed 9/8/23  P. v. Gonzalez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL ROBLES GONZALEZ,<br><br>    Defendant and Appellant. | H048636<br>(Santa Clara County<br>Super. Ct. No. C1780476) |

A jury found defendant Daniel Robles Gonzalez guilty of implied malice murder, assault likely to cause great bodily injury, misdemeanor vandalism, and infliction of corporal injury on a cohabitant.  The jury further found true various allegations and prior convictions, and Gonzalez admitted another prior conviction.  The trial court imposed an aggregate term of 45 years to life consecutive to 10 years in prison.

Gonzalez raises numerous claims on appeal.  He contends the evidence was insufficient to show implied malice murder; the trial court erroneously admitted lay opinion testimony from a police officer about her past experiences with crime scene witnesses; the trial court erroneously denied his motion to sever the domestic violence count from the remaining counts; the trial court erred by admitting portions of expert testimony on intimate partner violence; the trial court erroneously excluded defense testimony impeaching a complaining witness; and the cumulative prejudice from multiple errors requires reversal.  For the reasons below, we conclude these claims are without merit.

Gonzalez further contends we must remand for resentencing based on retroactive applications of Senate Bill No. 567 (Senate Bill 567) and Assembly Bill No. 518 (Assembly Bill 518). We conclude remand on those grounds is warranted. We will reverse the judgment and remand for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

The prosecution charged Gonzalez with four counts: count 1—murder of Baltazar Rudy Espinoza (Pen. Code, § 187)[1]; count 2—assault by means likely to produce great bodily injury against Baltazar Rudy Espinoza (§ 245, subd. (a)(4); count 3—vandalism with damages in an amount less than $400 (§ 594, subd. (b)(2)(A)); and count 4—inflicting corporal injury upon Sharon Espinoza with a specified prior conviction within seven years (§ 273.5, subd. (f)(1)). As to count 2, the prosecution alleged Gonzalez personally inflicted great bodily injury causing coma. (§§ 12022.7, subd. (b), 1203, subd. (e)(3).) The prosecution further alleged Gonzalez had suffered three prior strike convictions and two prior serious felony convictions. (§§ 667, subds. (a)-(i), 1170.12.)

The case proceeded to trial in April 2019. The jury found Gonzalez guilty as charged and found the allegations true. After waiving his right to a jury trial on an allegation of a strike prior, Gonzalez admitted he had suffered a prior conviction for first degree burglary in Texas. The trial court imposed an aggregate term of 45 years to life consecutive to 10 years in prison. The term consisted of 15 years to life on count 1 tripled for the strike priors, consecutive to a five-year term on count 4 doubled for the strike priors. The court stayed the term for count 2 under section 654 and imposed one day in county jail for count 3.

---

[1] Subsequent undesignated statutory references are to the Penal Code.

## B. Facts of the Offenses

Gonzalez's romantic partner Sharon Espinoza and her brother Baltazar "Rudy" Espinoza shared an apartment where Gonzalez would sometimes spend the night.[2] Gonzalez assaulted Rudy in an alley behind the apartment, causing a brain hematoma that resulted in Rudy's death two months later. At the time of the assault, Rudy was 65 years old and suffered from coronary artery disease, end-stage kidney disease, and hypertension. He required kidney dialysis, and he was walking with the assistance of a cane.

About a year before the assault, police had arrested Gonzalez for domestic violence against Sharon, but she refused to cooperate with the prosecution at the time.

### 1. The Assault on Rudy (Counts 1 and 2)

Sharon testified that she and Rudy were living in a two-bedroom apartment in November 2017. She had been romantically involved with Gonzalez for about four or five years, and he was spending nights at the apartment in November 2017. Around 7:00 a.m. on November 10, Gonzalez showed up at the apartment and Sharon got into an argument with him. Rudy was home at the time.

Sharon wanted Gonzalez to leave, but he did not. At some point during the argument, Gonzalez ripped his shirt off, and Sharon went to her bedroom, locking the door to keep him out. Gonzalez damaged the bedroom door. Sharon later heard Rudy talking to Gonzalez outside the apartment. Rudy told Gonzalez to leave and warned him the police were coming. Sharon then heard a thud, whereupon she left her bedroom, went out the back door of the apartment, and saw Rudy lying on the ground in the alley. Rudy's eyes were rolled back, he was not breathing, and there was blood on his nose. Sharon saw Gonzalez standing outside near the corner of a building in the alley. She did

---

[2] We refer to the victims by their first names to avoid confusion.

3

not see anyone else in the alley. Sharon tried to push on Rudy's chest, but he began gurgling, so she tried to turn him on his side.

Heather Brown testified that she was living in a neighboring apartment in November 2017. On the morning of November 10, she woke up to the sound of people screaming and yelling. She recognized Sharon's voice yelling for help. Brown stayed in bed for a while and the yelling went on for a long time. After a while, she called 911 because she "heard hits" and "it sounded like someone was being killed." Brown testified that at some point she went to the back of her apartment by the alley, cracked open the door, and looked outside into the alley. She saw Gonzalez's right arm hit Rudy's face between the eyes, and Rudy fell backwards. After the assault, Gonzalez walked down the alley with no shirt on while "acting wild," and he asked Brown, "Calling the cops?"

When the police arrived, they found Rudy lying on his side unconscious on the ground. His breathing was labored, he had a laceration on the corner of his mouth, and there was blood coming from his nostrils. Sharon, who was standing nearby, was hysterical. Gonzalez was standing calmly on the steps of a nearby apartment, showing no emotion. Police collected Gonzalez's shoes and clothes. A forensic analysis revealed bloodstains on his shoes and pants. Analyses of DNA found in the stains showed there were multiple contributors, with Rudy included as a possible contributor to the major component in both stains.

Rudy remained unconscious in the hospital until January 2018, when Sharon decided to take him off life support. His injuries included subdural hematomas; a possible fracture of the cribriform plate; a probable nasal bridge fracture; lacerations and abrasions to the face; rib fractures; and bleeding from the nose and mouth. There were no documented injuries to the rear of his head. The forensic pathologist testified that it would be "very uncommon" for those kinds of bone fractures to be caused by falling face-forward and hitting one's forehead on the ground. Similarly, the blunt force trauma

4

to Rudy's face could not be explained by simply falling backwards.  The injuries were consistent with being punched multiple times or punched once with significant force.

### 2. *The Domestic Violence Assault (Count 4)*

Sharon testified that she got into an argument with Gonzalez one night in October 2016 when she was living with him in a different apartment.  They did not get into a physical altercation, but Gonzalez called the police.  Sharon threatened to stab herself with scissors and blame it on Gonzalez, but she testified that she made this comment sarcastically.  When the police arrived, Sharon told them about a prior incident in August 2016 when Gonzalez had hit her in the head.

Sharon testified that she and Rudy were in the bedroom during the August 2016 incident when she told him to move out of the way and tried to nudge him with her hand.  She kicked the dresser with her foot to close the bottom drawer and Rudy heard the sound, prompting him to come to the bedroom door and ask Sharon if Gonzalez was hitting her.  Sharon told Rudy that Gonzalez had not hit her, so Rudy left.  Sharon then tried to leave the bedroom by going past Gonzalez, and he punched her in the head multiple times.  Sharon did not call the police because she was afraid to do so, and she was afraid of what her family might do to Gonzalez.  Instead, Sharon told Gonzalez she would cover for him, and she made up a story about being jumped by five girls.

When the police arrived in response to Gonzalez calling them in the October 2016 incident, Sharon told them about the August 2016 assault and showed them a photograph of bruises on her eye and face.  The police then arrested Gonzalez.  Later, when Sharon learned the district attorney was going to file charges against Gonzalez, she decided not to cooperate because she loved him and did not want him to go to jail.  She wrote a letter to the judge overseeing the case falsely stating that Gonzalez had not hit her, and that her injuries were caused when she was jumped by five girls.  The charges were dropped, Gonzalez was released, and Sharon resumed her romantic relationship with him.  Sharon testified that it was Gonzalez's idea for her to write this letter.

5

During Sharon's testimony in this case, the prosecution showed the jury the photograph of her bruised face that she had given to the police in October 2016, and she testified that the injuries were caused when Gonzalez hit her in the August 2016 incident.

## II. DISCUSSION

### A. *Sufficiency of the Evidence for Implied Malice Murder*

Gonzalez contends we must reverse his conviction for implied malice murder because the evidence was insufficient to prove he disregarded a known risk of death in the assault on Rudy. The Attorney General argues the conviction was supported by evidence that Gonzalez knew Rudy's age and physical ailments made him a vulnerable victim and Gonzalez neither rendered aid nor expressed remorse after the assault.

### 1. *Legal Principles*

Second degree implied malice murder is the unlawful killing of a human being when the killing resulted from an intentional act, the natural consequences of the act are dangerous to human life, and the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. (*People v. Swain* (1996) 12 Cal.4th 593, 601.) When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his or her act would result in the death of a human being. (*Ibid.*) The mental component of implied malice is ordinarily proven by illustrating the circumstances leading to the ultimate deadly result. (*People v. Guillen* (2014) 227 Cal.App.4th 934, 988.) "This state has long recognized 'that an assault with the fist . . . may be made in such a manner and under such circumstances as to make the killing murder.' [Citation.] However, 'if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508 (*Cravens*).)

"To assess the evidence's sufficiency, we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime or

6

special circumstances beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, citing *People v. Maury* (2003) 30 Cal.4th 342, 403.)  The record must disclose substantial evidence to support the verdict such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*Ibid.*)  The substantial evidence must be reasonable, credible, and of solid value.  (*Ibid.*)  We review the evidence "in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence."  (*Ibid.*)  "A reversal for insufficient evidence 'is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support' the jury's verdict."  (*Ibid.*)  The standard is the same under both the California Constitution and the federal Constitution.  (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 392.)

### 2.  *The Evidence Was Sufficient to Support a Finding of Implied Malice*

Gonzalez does not dispute that the evidence was sufficient to establish the physical component of implied malice—that Gonzalez's act of intentionally striking Rudy resulted in his death, and that the natural consequences of the act were dangerous to human life. Gonzalez argues only that insufficient evidence supported the mental component— whether he deliberately performed the act with knowledge of the danger to, and with conscious disregard for, human life.

The Attorney General argues Gonzalez was aware at the time of the attack that Rudy was physically vulnerable due to his myriad ailments requiring kidney dialysis, among other treatments.  Rudy was 65 years old.  Sharon testified that he was five feet nine inches tall, weighed about 220 pounds, and had been using a cane for about six years.  A cane was found on the ground in the area of the attack.  Rudy suffered from end-stage renal failure and received kidney dialysis three times a week.  He also suffered from coronary heart disease, and he required Sharon's assistance with the activities of daily living such as getting dressed, shaving, cooking, and cleaning his clothes.

7

Gonzalez had been in a romantic relationship with Sharon for about four or five years prior to the assault. He had lived with her in the apartment as recently as October 2016, and he was spending nights at the apartment in November 2017. Gonzalez had spent a lot of time at the apartment with both Rudy and Sharon. Sharon had talked to Gonzalez about Rudy's various health problems, and Gonzalez had gone to the hospital with Rudy and Sharon. Jurors could reasonably infer from this evidence that Gonzalez was aware of Rudy's vulnerable physical condition at the time of the assault.

The prosecution also presented evidence from which jurors could reasonably infer Gonzalez punched Rudy with enough force to cause the fatal brain injuries, as opposed to the fatal injuries being caused by contact with the ground. The injuries to Rudy included subdural hematomas; a possible fracture of the cribriform plate; a probable nasal bridge fracture; lacerations and abrasions to the face; rib fractures; and bleeding from the nose and mouth. He was found lying face-up on the ground, and there were no documented injuries to the rear of his head. The forensic pathologist testified that it would be "very uncommon" for those kinds of bone fractures to be caused by falling face-forward and hitting one's forehead on the ground. Similarly, the blunt force trauma to Rudy's face could not be explained by simply falling backwards. The injuries were consistent with being punched multiple times or punched once with significant force. Together with the evidence showing Gonzalez was aware of Rudy's vulnerable physical condition, jurors could find beyond a reasonable doubt that Gonzalez assaulted Rudy with conscious disregard for his life, striking him either multiple times or with significant force. This evidence was sufficient to establish implied malice.

Gonzalez relies on *Cravens*, *supra*, 53 Cal.4th 500. Cravens was convicted of murdering a man who was smaller and shorter than Cravens, and who was intoxicated, exhausted, and vulnerable, having a blood-alcohol level of 0.17 percent. (*Id.* at p. 508.) Cravens, standing on a curb while the victim was standing at street level, struck the victim "extremely hard" with a "sucker punch," knocking him unconscious before he hit

8

the pavement. The California Supreme Court held these facts were sufficient to sustain a conviction for implied malice murder. (*Id.* at p. 512.) Gonzalez argues that his conduct does not rise to that level because there was no evidence he punched Rudy with "extreme" force or took him by surprise with a "sucker punch." But *Cravens* is distinguishable on its facts. There, the victim was a 24-year-old professional surfer, and apart from being intoxicated, he was not physically or medically vulnerable like Rudy was. Further, *Cravens* did not establish that certain facts are necessary to prove implied malice murder, such as the use of surprise or extreme force. The absence of those specific facts in this case does not render the evidence insufficient.

Similarly, Gonzalez relies on *People v. Palomar* (2020) 44 Cal.App.5th 969, another case affirming a murder conviction based on sufficient evidence of implied malice. Based on facts comparable to those in *Cravens*, the Court in *Palomar* concluded malice was shown by the defendant's use of " 'an extremely powerful blow to the head calculated to catch the impaired victim off guard, without any opportunity for the victim to protect his head, and thereby deliver the victim directly and rapidly at his most vulnerable to a most unforgiving surface.' " (*Palomar*, at p. 977.) As with *Cravens*, the facts of *Palomar* are not precisely with comparable to the facts of this case, but neither does *Palomar* hold that any of its specific facts must be proven to establish implied malice.

For the reasons above, we conclude that Gonzalez's claim that the evidence was insufficient to support a verdict of implied malice murder is without merit.

### B. Admission of Lay Opinion Testimony

Heather Brown, a witness at the scene of the assault, initially told police she did not see what happened to Rudy, but she testified at trial that she saw Gonzalez strike him. Gonzalez contends the trial court erroneously admitted lay opinion testimony by a police officer who testified it is not uncommon for witnesses to initially tell police at a crime scene they did not see what happened, only to find out after further investigation that the

9

witness did see something.  The Attorney General contends the trial court did not abuse its discretion, and that even if the ruling was erroneous, it was harmless.

### 1.  Factual Background

As set forth above in section I.B.1, neighbor Heather Brown testified that she heard yelling and screaming, and that Sharon was yelling for help.  After some time, Brown called 911.  She heard what sounded like somebody getting hit multiple times, and when she looked out her back door into the alleyway, she saw Gonzalez's right arm hitting Rudy's face, whereupon Rudy fell to the ground.  After the police arrived at the scene, however, Brown told one of the officers she did not see anything.

On cross-examination, the police officer testified that she did not find anyone at the scene who told her they witnessed the assault.  On redirect examination, the prosecutor asked the officer, "Have you personally investigated crimes as a detective or otherwise where you talked to someone initially, possibly at a crime scene or otherwise, who says that they didn't see what happened, but then through later investigation, you find out that they actually did see something?"  Defense counsel objected to this question as irrelevant and speculative, but the trial court overruled the objection, and the officer responded, "Yes."  The prosecutor then asked, "In your experience as a detective, is that something that's wildly uncommon?"  The officer answered, "It's not uncommon at all."

### 2.  Legal Principles

"No evidence is admissible except relevant evidence."  (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)

"If a witness is not testifying as an expert, his [or her] testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is:  (a) Rationally based on the perception of the witness; and (b) Helpful

10

to a clear understanding of his [or her] testimony." (Evid. Code, § 800.) However, "[l]ay opinion about the veracity of particular statements by another is inadmissible on that issue." (*People v. Melton* (1988) 44 Cal.3d 713, 744 (*Melton*).) Expert opinion about the veracity of a witness is generally inadmissible as well. "The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.)

"We review a trial court's rulings on the admission and exclusion of evidence under the abuse of discretion standard." (*People v. Thompson* (2010) 49 Cal.4th 79, 128.)

### 3. *The Trial Court Did Not Prejudicially Err*

Gonzalez characterizes the officer's testimony as improper vouching for Brown's credibility as a witness. As Gonzalez acknowledges, the officer's testimony did not specifically mention Brown, and the officer did not offer any opinion on whether any portion of Brown's testimony was credible. Gonzalez argues the officer's testimony was the "functional equivalent" of vouching because it supported an inference that Brown's testimony at trial was more credible than her initial statement to police. He contends this inference was impermissible whether the testimony constituted lay or expert opinion, and he argues there was no theory of relevance under which the testimony would have been admissible.

Gonzalez relies on *Melton*, *supra*, 44 Cal.3d 713. In *Melton*, the prosecutor cross-examined a defense investigator about his response to a witness who had claimed a third party named "Charles" committed the murder for which Melton was charged. (*Id.* at p. 742.) The defense investigator responded he did not look for Charles because the witness's claim "was not of a sufficient quality to even, in my mind, to begin to look for

11

Charles." (*Ibid.*) The California Supreme Court held this evidence was "irrelevant and incompetent" because it was offered to show the investigator did not believe the witness and was therefore inadmissible opinion testimony about the witness's veracity. (*Id.* at p. 744.) The Court, however, held the error was harmless. (*Id.* at p. 745.) The Court further observed that other portions of the defense investigator's testimony "about the details, or lack thereof, in [the witness's] information was entirely proper, since these were facts bearing on its credibility." (*Ibid.*)

In *Melton,* the defense investigator's testimony directly impugned the witness's credibility, whereas here the officer's testimony did not specifically mention Brown or her testimony. But Gonzalez persuasively argues that the only potential relevance of the officer's testimony was to support an inference that Brown's trial testimony should be believed over her initial statement. Neither the prosecutor nor the Attorney General suggest any other theory of relevance, and as in *Melton*, we discern no other argument that would render the officer's testimony admissible.

Although we conclude it was error to admit the testimony, any error was harmless. First, the trial court instructed the jury, "You alone must judge the credibility or believability of the witnesses," and told the jury it could consider prior inconsistent statements in doing so. The jury was able to view Brown testifying and heard evidence of her prior statement to the police. Nothing in the record shows jurors were unable to assess Brown's credibility in light of her prior inconsistencies. "We presume absent contrary indications that the jury was able to follow the court's instructions." (*People v. Pinholster* (1992) 1 Cal.4th 865, 919, disapproved on other ground by *People v. Williams* (2010) 49 Cal.4th 405.)

Further, the police officer's testimony about her experience with generic witnesses was peripheral and "minimal in context," just as the Court in *Melton* characterized the defense investigator's testimony. (*Melton*, *supra*, 44 Cal.3d at p. 745.) And separate from Brown's testimony, there were multiple other sources of evidence that Gonzalez

12

had struck Rudy, including circumstantial evidence of Gonzalez's conduct before and after the assault, and forensic evidence of Rudy's blood on Gonzalez's pants and shoes. We conclude any error was harmless because there was not a reasonable probability the outcome would have been more favorable to Gonzalez had the trial court excluded the officer's testimony. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [reversal based on state law error required only if it is reasonably probable a result more favorable to the appealing party would have been reached in the absence of the error].)

Gonzalez contends the trial court violated his federal rights to due process and a fair trial, such that harmlessness should be assessed under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) (requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained). Even assuming the trial court's ruling constituted an abuse of discretion, we are not persuaded that the admission of the officer's testimony rendered the trail fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439 [the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair].)

For the reasons above, we conclude this claim is without merit.

## C. *Denial of Motion to Sever*

Gonzalez contends the trial court erred in denying his motion to sever count 4 (inflicting corporal injury with a specified prior conviction within years) from the remaining counts. The Attorney General contends the trial court properly denied the motion to sever.

### 1. *Legal Principles*

Section 954 provides in part, "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts." (§ 954.) The trial court "in the interests of justice and for good

cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." (*Ibid.*)

We review the denial of a motion to sever for abuse of discretion. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.) " 'The state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of evidence.' [Citations.]" (*Id.* at p. 1221.)

"Because it ordinarily promotes efficiency, joinder is the preferred course of action. When the statutory requirements are met, joinder is error only if prejudice is clearly shown." (*People v. Scott* (2011) 52 Cal.4th 452, 469.) " ' "In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.' " [Citation.] "The relevant factors are whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges converts the matter into a capital case." [Citation.] "[I]f evidence underlying the offenses in question would be 'cross-admissible' in separate trials of other charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses." [Citations.] "[A] jury may consider properly admissible 'other crimes' evidence so long as it finds 'by a preponderance of the evidence' that the defendant committed those other crimes." ' [Citation.] [¶] When evidence is offered under Evidence Code section 1101, subdivision (b), the degree of similarity required for cross-admissibility ranges along a continuum, depending on the purpose for which the evidence is received. The least degree of similarity is required to prove intent. A higher

14

degree is required to prove common plan, and the highest degree to prove identity. [Citations.]" (*Scott,* at pp. 469-470.)

### 2. Procedural Background

Gonzalez moved pretrial to sever count 4 from the remaining charges on the grounds they were improperly joined in violation of section 954, and a joint trial would unduly prejudice him in violation of his due process and fair trial rights. He argued the domestic violence charge in count 4 did not constitute a crime of the same class as the other charges; that the evidence underlying the charges was not cross-admissible; and that joinder would present the risk of undue prejudice given the inflammatory nature of the murder allegations. The prosecution opposed severance on the ground that the charges constituted offenses of the same class or were connected in their commission, and that the evidence underlying them was cross-admissible based on factual similarities in Gonzalez's conduct during the crimes.

The trial court denied the motion to sever. First, the court found the charges were of a similar class because both offenses involved assaultive conduct that could result in serious injury or death. Second, the court found the offenses were connected in their commission because they involved common material elements of substantial importance. The court further ruled the evidence was cross-admissible and found the risk of undue prejudice was not substantially outweighed by the probative value from cross-admission.

### 3. The Trial Court Did Not Err in Denying the Motion to Sever

Gonzalez contends section 954 required severance because the domestic violence offense against Sharon and the assault/murder of Rudy were neither of the same class nor connected in their commission, and joinder was unduly prejudicial. He argues the offenses shared no material elements or facts, and the domestic violence charge opened the door to prior incidents, creating an undue risk the jury would profile him as an abuser and convict him of murder despite weaknesses in the evidence that he struck Rudy or acted with implied malice. He contends the trial court's ruling constituted an abuse of

15

discretion and denied him a fair trial, requiring us to reverse the judgment. The Attorney General contends the crimes were of the same class because they both involved aggravated assaults upon another person.

" 'Offenses of the same class are offenses which possess common characteristics or attributes.' [Citation.]" (*People v. Landry* (2016) 2 Cal.5th 52, 76.) The California Supreme Court has upheld joinder in numerous cases where the joined offenses belonged to the same class because they involved assaultive conduct. (See *People v. Trujeque* (2015) 61 Cal.4th 227, 259 [for purposes of section 954, robbery and murder are the same class of crime, both involving a common element of assault on the victim]; *People v. Merriman* (2014) 60 Cal.4th 1, 36 [sexual offense charges were properly joined with murder count because they were assaultive crimes against the person and therefore belong to the same class of crimes]; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1243 [robbery and murder are the same class of crime as both involve a common element of assault on the victim]; *People v. Arias* (1996) 13 Cal.4th 92, 127 [trial court correctly determined offenses involving assaultive behavior were of the same class and thus properly joinable]; *People v. Walker* (1988) 47 Cal.3d 605, 622 [section 954 permits joinder of all assaultive crimes against the person, all of them being considered "of the same class"].) Here, both the domestic violence charge and the assault/murder charges involved assaultive behavior. This aspect of the trial court's ruling was not an abuse of discretion.

Second, the Attorney General contends the crimes were connected in their commission. " 'Offenses "committed at different times and places against different victims are nevertheless 'connected together in their commission' when they are . . . linked by a ' "common element of substantial importance." ' [Citations.]" ' [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 119.) In the domestic violence incident, the prosecution alleged Rudy attempted to intervene after Gonzalez struck Sharon in the bedroom of the home where Sharon and Rudy lived. The prosecution further alleged that

16

just prior to the assault on Rudy, Gonzalez was engaged with a dispute with Sharon when she kicked him out of her home. Sharon had locked herself in the bedroom, whereupon Gonzalez struck the bedroom door and damaged it. Gonzalez's assault on Rudy ensued. Both offenses involved assaults against members of the same family at the family's home. Joinder based in part on these factors did not constitute an abuse of discretion.

Third, the Attorney General contends the trial court properly ruled that evidence in the offenses was cross-admissible under Evidence Code section 1101, subdivision (b), an exception to the inadmissibility of character evidence where other acts are relevant to prove facts such as motive, intent, and knowledge, among others. The trial court found that the severity of facial bruising suffered by Sharon after Gonzalez punched her during the domestic violence assault was relevant to show he was aware of his capacity to inflict seriously injurious force with a punch to the face. The same evidence was relevant to show Gonzalez's state of mind in the attack on Rudy, disproving Gonzalez's assertion that Rudy's death was accidental. (See, e.g., *People v. Whisenhunt* (2008) 44 Cal.4th 174, 204 [prior acts of child abuse relevant to show intent and absence of accident in prosecution of murder charge].) The court further found the evidence was relevant to show motive because the offenses both involved victims having a close relationship with Gonzalez. The trial court's ruling of cross-admissibility on these grounds did not constitute an abuse of discretion.

Finally, the trial court found the probative value in cross-admissibility of the evidence underlying the charges was not substantially outweighed by the danger of prejudice. Gonzalez argues there was a high risk the jury would profile him as an abuser based on the prior domestic violence incidents, thereby using the evidence to improperly infer he committed the charged offenses based on his character. But the trial court instructed the jury against any such use of the evidence, allowing the jury to use the evidence for the limited purposes set forth in Evidence Code section 1101. While it may have been harmful to Gonzalez's defense for the jury to hear evidence of the prior

17

domestic violence incidents, that alone does not render the evidence unduly prejudicial. To say evidence is "prejudicial" means it "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) " 'In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.) Given the trial court's limiting instruction, we conclude the trial court did not abuse its discretion by denying the motion on the ground that the probative value of the evidence was not substantially outweighed by the danger or prejudice.

For the reasons above, the trial court did not abuse its discretion in denying the motion to sever, and joinder did not violate Gonzalez's federal fair trial and due process rights. Accordingly, we conclude this claim is without merit.

### D. Admission of Expert Testimony on Intimate Partner Violence

Gonzalez contends the trial court erred by admitting portions of testimony from the prosecution's expert on intimate partner violence because they exceeded the permissible scope of expert testimony on that subject and violated the court's in limine rulings. The Attorney General contends Gonzalez has not shown prejudicial error, and that he forfeited the present claim by failing to object on the same basis below.

#### 1. Legal Principles

"In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Evid. Code, § 1107, subd. (a).)

18

"Except to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

### 2. *Background*

The prosecution moved in limine for the admission of expert testimony on intimate partner violence on the ground that it was "relevant to explain not just the effects on a particular victim, but also the myths, commonly held misconceptions and the general effects of battering." At a hearing on the motion, the prosecution argued the evidence was "relevant to explain why [Sharon] would recant following her initial report and other certain of [*sic*] her behaviors." Gonzalez moved to exclude the testimony on the grounds there was no foundation for such testimony because there was no evidence Sharon suffered from battered woman syndrome, and that this evidence would be irrelevant and prejudicial. The trial court granted the prosecution's motion and denied the motion to exclude, finding the record did not establish Sharon was not suffering from battered woman syndrome.

At trial, the prosecution's expert, Richard Ferry, described intimate partner violence and its psychological effects on a battered woman who experiences physical, verbal, or emotional abuse inflicted by an abusive partner. He testified that he had not interviewed Gonzalez or any complaining witnesses, he had not read the police reports, and he knew "[a]lmost nothing" about the facts of this case. Ferry opined that an abuser seeks to establish power and control over the abused partner because an abuser has "poorly developed ego functions" and tends to be unable to tolerate the emotions that arise when the abused partner acts defiantly or separates herself from the abuser. This may cause the abuser to "plunge into a flood of emotions that are unbearable for the abuser," such as feelings of abandonment, anxiety, loss of self-esteem, and depression, collectively referred to as "abandonment depression." This causes the abuser to act out

19

by exerting control over the abused partner, which may be done through screaming, hollering, or using physical violence. Ferry testified in detail about the causes and composition of abandonment depression, and how the abuser reacts to it. The abuser may experience their neediness as humiliating, which often brings them to a point of "righteous indignation and the use of violence." Defense counsel did not object to any of this testimony.

The prosecutor then asked Ferry a series of hypothetical questions that mirrored the facts of the case—e.g., whether the abuser could feel a loss of power if the abuser was homeless and got kicked out of his partner's home or locked out of a room in the home. Ferry answered affirmatively. The prosecutor then asked about whether an abuser might make verbal threats of various kinds against the abused partner. In one such question, the prosecutor asked, "Hypothetically, what about a more—a verbal threat, like, 'I'll wait for you to come outside. Then I'm going to kick your fucking ass'?" Ferry responded that it would be "kind of intimidating." Defense counsel did not expressly object but requested a sidebar, whereupon the parties approached the court for a discussion off the record. At the end of the sidebar, the prosecutor continued his examination of the expert with no objections from defense counsel.

Defense counsel later set forth his position on the record, outside of the presence of the jury. Counsel stated that the prosecution had previously offered the expert to educate the jury in general about domestic violence, but the prosecutor was now asking the expert specific questions based on the incidents that occurred in this case. Counsel argued that the prosecution was using the expert "to present evidence that Sharon is the victim, that she behaves and reacts in a way consistent with being the victim of domestic violence." Counsel argued that he therefore should have been allowed to present evidence "to show that Sharon has more in common with an abuser than with a victim." Counsel proffered witnesses who could testify that Sharon had struck Gonzalez on multiple occasions, and that she had hurt herself because she believed Gonzalez was

20

going to jail. Counsel argued Gonzalez was being denied the right to present a defense, and moved for admission of the proffered evidence.

The prosecution responded that defense counsel's argument was conflating the admissibility of expert testimony with other issues, and that the expert's testimony was proper, including the hypothetical questions that paralleled the facts of the case. The prosecution acknowledged that at the sidebar the court had given "guidance" with respect to one of the hypothetical questions, and in response the prosecutor had "adjusted the tone of my examination going forward."

With respect to the prosecution's hypothetical questions, defense counsel stated, "[T]hat's fine. It is proper. There's nothing wrong with that. But when we did in limines, it was for general use only, general education. [¶] My point is that's fine. He didn't do anything wrong, but he certainly opened the door to allow me to bring in my specific instances of conduct to reflect whether or not [Gonzalez] or Sharon share in the characteristics as laid out by Mr. Ferry." Defense counsel continued to argue that Gonzalez was being denied the right to present a defense, and added, "It's not the fact that he called Mr. Ferry. It's not the fact that he examined him. It's that, again, he's made my evidence that was previously ruled to be inadmissible relevant and admissible. That was my point."

The court then stated that it had interpreted defense counsel's statements at the sidebar to be an objection to the expert's testimony exceeding the scope of the in limine ruling. The court stated that it had reviewed the in limine ruling and that the expert's testimony was within the scope of that ruling. The court then denied the motion to admit the proffered evidence of Sharon's conduct toward Gonzalez.

After the close of evidence, the trial court instructed the jury on the permissible uses of Ferry's testimony, stating in part, "You have heard testimony from Richard Ferry regarding the effect of intimate partner battery. Mr. Ferry's testimony about intimate partner battery is not evidence that the defendant committed any of the crimes charged

21

against him.  You may consider this evidence only in deciding whether or not Sharon Espinoza's . . . conduct was inconsistent with the conduct of someone who has been abused . . . and in evaluating the believability of her testimony."

### 3. *Admission of the Expert Testimony Was Not Prejudicial Error*

Gonzalez contends the expert's testimony exceeded the scope of the in limine ruling.  Gonzalez argues the prosecution "represented to the court that it would be properly limited, as prescribed by statute, to victims' perceptions and behaviors in general in order to dispel misconceptions jurors may have about inconsistencies between Sharon's behavior and her claim she suffered domestic violence at [Gonzalez]'s hands."  The record shows the prosecution argued the evidence was "relevant to explain not just the effects on a particular victim, but also the myths, commonly held misconceptions and the general effects of battering."  The prosecution further argued at the hearing that the evidence was relevant to explain why Sharon would recant her initial report and other behaviors.  In granting the prosecution's motion, the trial court did not specify any other limitations on the use of the evidence.

The Attorney General contends Gonzalez forfeited this claim by failing to object below.  Defense counsel's statements as memorialized in the record of the sidebar discussion do not include an explicit objection to the expert's testimony on the grounds now asserted.  (See Evid. Code, § 353, subd. (a) [requiring a timely objection on the record specifically stating the ground for it].)  Counsel's primary contention was that Gonzalez should be permitted to introduce evidence Sharon had acted abusively toward him because the expert's testimony had opened the door to it.  Defense counsel did nonetheless assert that the expert's testimony went beyond the purposes for which it was offered, and the trial court stated that it had interpreted counsel's argument as the sidebar as being an objection on that ground.  Accordingly, we will consider the merits of that claim.

22

The trial court's ruling on this point was not an abuse of discretion. In its pretrial motion, the prosecution broadly offered the evidence to explain the effects of battering on a victim in addition to dispelling commonly held misconceptions. The prosecution then specifically argued it was relevant to explain Sharon's recantation in addition to other behaviors, but the prosecution did not specify exactly which behaviors it might explain or exactly what the effects of battering on a victim might entail. The trial court's ruling did not further clarify any such limitations. The exact scope of the in limine ruling was therefore somewhat ambiguous, but defense counsel did not seek any clarification on these points.

In any event, the trial court's ruling, while not expressly stating the permissible uses of this evidence, could reasonably be construed as admitting the evidence only for the general purposes outlined by the prosecution. Much of the expert's testimony that Gonzalez now challenges fell within those bounds. Gonzalez contends the expert's testimony impermissibly focused on the conduct of the abuser, not the abused, but the former was relevant to explain the latter. For example, Ferry's testimony about how abusers react to their circumstances by acting out and exerting control was relevant to explain how the abused partner reacts in turn by submitting to the control in an attempt to mollify the abuser. To the extent the scope of the in limine ruling was ambiguous as to a specific piece of testimony, the court's post-sidebar ruling on the admissibility of the identified testimony did not constitute an abuse of discretion.

Gonzalez argues the expert's testimony also exceeded statutory limitations on such testimony by creating a profile of Gonzalez as an abuser, supporting the prosecution's theory that Gonzalez exploded when Rudy asked him to leave. For this proposition, Gonzalez relies on *People v. Robbie* (2001) 92 Cal.App.4th 1075 [expert witness regarding rapist profile characteristics was inadmissible].) But defense counsel never lodged any objection on this point. After asserting without objection that the testimony exceeded the scope of the in limine ruling, counsel complained the testimony was

23

creating the impression that Sharon was a victim—not that Gonzalez was an abuser—and on this ground, counsel argued he should be allowed to introduce evidence that she was in fact the abuser. Counsel never objected to the hypothetical questions offered by the prosecutor or any testimony by the expert as impermissibly profiling Gonzalez. To the contrary, counsel stated the hypothetical questions were "fine," "proper," and "there's nothing wrong with that," adding, "It's not the fact that he called Mr. Ferry. It's not the fact that he examined him. It's that, again, he's made my evidence that was previously ruled to be inadmissible relevant and admissible." Defense counsel thereby forfeited the "profiling" claim with respect to Ferry's testimony.

Regardless, we would find no prejudicial error in the trial court's ruling. The expert's testimony was couched in terms of hypotheticals, and the trial court properly instructed the jury the evidence could not be used as evidence that Gonzalez committed the charged crimes. Gonzalez makes no showing that the jury failed to adhere to this instruction or used the evidence in any other impermissible fashion. (See *Pinholster*, *supra*, 1 Cal.4th at p. 919 [we presume absent contrary indications that the jury was able to follow the court's instructions].) Gonzalez argues the trial court's instruction did not limit application of Ferry's testimony to the domestic violence count. But as to impermissible uses of the evidence, the court instructed the jury it could not be used as evidence he committed "*any* of the crimes charged against him." (Italics added.) Furthermore, as to the assault and murder charges, none of the expert's testimony pertained to Gonzalez's relationship with Rudy. The testimony was presented in the context of an intimate partner relationship wherein the abuser exerts dominance and control over a battered woman through acts of verbal or physical violence. No reasonable juror could have inferred that this testimony applied to Gonzalez's relationship with Rudy.

Gonzalez further contends admission of this evidence violated his constitutional right to a fair trial, resulting in a miscarriage of justice and requiring harmless error under

24

the federal standard. (See *Chapman*, *supra*, 386 U.S. at p. 24 [requiring the beneficiary of the error to show it was harmless beyond a reasonable doubt].) We perceive no such miscarriage based on this record. For all these reasons, we conclude this claim is without merit.

### E. Exclusion of Defense Evidence Impeaching the Complaining Witness

Gonzalez contends the trial court violated his confrontation rights, his right to present a defense, and his right to a fair trial by excluding portions of testimony from third parties about several incidents in which Sharon allegedly struck Gonzalez. He argues this evidence was admissible to impeach Sharon's credibility because she only admitted hitting Gonzalez on one occasion. The Attorney General contends the trial court did not abuse its discretion by excluding the testimony under Evidence Code section 352.

#### 1. Background

In his cross-examination of Sharon, defense counsel asked her if she had ever been violent with Gonzalez, and Sharon initially denied that she had. Defense counsel then reminded her that at a prior hearing she had previously denied being violent with Gonzalez, but that when she was confronted at that hearing with an audio recording of an incident, she admitted she had hit Gonzalez.

Defense counsel then asked Sharon again if she had ever hit Gonzalez, and she responded, "I guess I have, yeah." When defense counsel asked Sharon how many times she had hit Gonzalez, she responded that it "had to be" only "[o]ne time." She denied she had ever struck Gonzalez while he was wearing a back brace.

Outside the presence of the jury, defense counsel proffered statements from a witness identified as Ronnie Lastra to the effect that Sharon had acted violently toward

25

Gonzalez.[3]  Counsel argued the statements impeached Sharon's credibility and demonstrated crimes of moral turpitude.  After determining that none of the alleged incidents occurred at the times of the charged offenses, the court excluded the proffered evidence.  The court ruled that while the allegations had some "secondary" relevance for impeachment purposes, they presented an undue risk of prejudice, confusing the issues or misleading the jury, and would require an undue consumption of time under Evidence Code section 352.

After Richard Ferry testified as an expert on intimate partner violence as described above in section II.D.2, defense counsel renewed his motion to introduce evidence from Ronnie Lastra that Sharon had acted violently toward Gonzalez.  Counsel proffered similar statements from a witness identified as Misti Carroll, and argued that both witnesses' statements were admissible not only for impeachment purposes, but also to show Gonzalez reacted nonviolently to acts of violence in conformity with his nonviolent character.  The trial court reiterated its prior rulings on the matter but agreed to hold a hearing under Evidence Code section 402 for further consideration of the renewed motion.

At a hearing outside the presence of the jury, Lastra testified she was a second cousin to Rudy and Sharon, and that she had lived with them at their apartment in late 2016 and early 2017 when Gonzalez was also living there.  Lastra testified that on one occasion she saw Sharon and Gonzalez arguing, and when Gonzalez tried to walk out the door, Sharon "slugged him really hard in the back," causing him to gasp for breath. Gonzalez was wearing a back brace at the time.  On a second occasion, Lastra saw Sharon shove Gonzalez with both hands, and on a third occasion, Sharon punched him in

---

[3] Defense counsel apparently submitted a three-page memorandum to the court detailing Lastra's statements, but the memorandum is not in the record, and the court did not repeat the statements in detail.

the arm. Gonzalez never responded aggressively, and he never hit Sharon or yelled back at her during these arguments.

Misti Carroll testified outside the presence of the jury that she had stayed at the apartment with Rudy and Sharon during times when Gonzalez was also living there. Carroll testified that she never saw Gonzalez act violently toward Sharon, but she was violent toward him. One occasion, Sharon and Gonzalez were arguing in the bedroom when Sharon hit him "square in the jaw." Gonzalez tried to walk away, but Sharon started screaming, "jumped on him," and refused to let him go. Gonzalez went back in the bedroom and sat down. On a second occasion, Carroll saw Sharon hit Gonzalez in the back with a broom as he was walking out the door. Gonzalez did not respond with violence. On other occasions, Carroll saw Sharon hit Gonzalez on the arm, but Carroll did not think these punches were "severe" and instead thought they were only "playing" like kids do.

As to both witnesses, the trial court ruled that their testimony about Gonzalez's nonviolent reactions to these incidents were relevant and admissible as evidence of his character trait for nonviolence under Evidence Code section 1102. However, the court also ruled that because Gonzalez was not asserting self-defense in response to any of the charged offenses, Sharon's identity as the attacker was irrelevant and inadmissible to show she was the person who had attacked Gonzalez. The court further found that Sharon had "essentially . . . admitted to prior incidents of domestic violence" such that identifying her would provide no additional probative value through impeachment. Accordingly, the court ruled that the witnesses could testify to seeing the attacks and Gonzalez's reaction to them, but that the witnesses would not be allowed to identify Sharon as the attacker. Both witnesses testified before the jury accordingly.

### 2. *Legal Principles*

"[E]vidence bearing on the issue of credibility of witnesses comes within the basic rule that all relevant evidence is admissible, except as specifically provided by statute."

27

(*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357.)  Evidence Code section 352 gives trial courts discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  "Rulings under Evidence Code section 352 come within the trial court's broad discretion and will not be overturned on appeal absent a showing of an abuse of that discretion."  (*People v. Brooks* (2017) 3 Cal.5th 1, 43.)

### 3. *Exclusion of Testimony Identifying Sharon as an Attacker Was Not an Abuse of Discretion*

Gonzalez argues the trial court erred by excluding evidence of Sharon's identity as an attacker because she was a critical witness for the prosecution, and the excluded testimony had substantial impeachment value.  He argues the court erroneously found Sharon had already admitted to prior incidents of domestic violence against Gonzalez, and that the proffered testimony rebutted her claim she had only hit him once.  Gonzalez further argues that identifying Sharon would have taken no more time than the witnesses' testimony to the same conduct by an unidentified attacker.  Finally, Gonzalez argues his Sixth Amendment right to confrontation outweighed any interest in expediency, and that excluding Sharon's identity left the jury with an "unjustified aura" of her credibility, violating his right to a fair trial.

The Attorney General argues Sharon's credibility was impeached in multiple other ways, such that any additional probative value from identifying her as the attacker was insignificant.  For example, Sharon admitted she had been addicted to illegal drugs, and she suffered from multiple mental health issues including schizophrenia.  She admitted having six prior convictions for petty theft.  She admitted she had written a letter to a judge in a prior case falsely stating that injuries she had actually suffered in the August 2016 domestic violence incident were caused when five girls jumped her.  Furthermore, when defense counsel confronted Sharon with her prior testimony denying she had ever

28

hit Gonzalez, she conceded that testimony was false and admitted that she had hit him on one occasion. The impeachable testimony consists of Sharon's claim that she had only hit him once as opposed to multiple times, and that he was not wearing a back brace at the time.

Gonzalez persuasively argues that once Lastra and Carroll were allowed to testify about the incidents, the additional time that would have been required to identify Sharon as the attacker would likely have been minimal. The trial court, however, also cited the potential risk of confusing the issues and misleading the jury that such testimony would have entailed. We cannot say the trial court abused its discretion in so ruling. Jurors may have been improperly influenced to feel enmity toward or bias against Sharon for reasons having nothing to do with her credibility. The sole relevance of identifying Sharon as the attacker was to impeach her testimony that she only attacked Gonzalez once, and as the Attorney General points out, Sharon's credibility was impeached in multiple other ways. The trial court was within its discretion to limit the testimony to avoid identifying Sharon, as there was minimal additional probative value from impeaching her on the detail of whether she hit Gonzalez more than once.

Gonzalez argues the trial court's ruling violated his Sixth Amendment right to confront witnesses against him. For this proposition, he cites cases concerning restrictions on a defendant's ability to cross-examine prosecution witnesses. (See *Davis v. Alaska* (1974) 415 U.S. 308, 317 [refusal to allow defendant to cross-examine key prosecution witness about his probation status violated defendant's right to confront witnesses]; *People v. Peoples* (2016) 62 Cal.4th 718 [trial court did not abuse its discretion by limiting cross-examination of prosecution's expert witness]; *U.S. v. Adamson* (9th Cir. 2002) 291 F.3d 606, 612 [the Confrontation Clause of the Sixth Amendment secures a defendant's right to cross-examine government witnesses].) But here the challenged ruling placed limitations on Gonzalez's questioning of defense

29

witnesses, not Gonzalez's cross-examination of Sharon about the incidents. Those cases are therefore inapposite.

The claim is more accurately framed in the context of a defendant's right to present a defense. Some courts have cited the Sixth Amendment as the source of a defendant's constitutional right to present a defense, while other courts cite due process. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' [Citations.]" (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.) "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." (*Washington v. Texas* (1967) 388 U.S. 14, 19.)

As a general matter, courts may limit the presentation of evidence if it is concerned about "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) "[T]he right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' [Citation.]" (*Rock v. Arkansas* (1987) 483 U.S. 44, 55.) Accordingly, cases applying the right to present a defense to limitations on a defendant's questioning of defense witnesses have typically deferred to a trial court's rulings under state law evidentiary rules provided the ruling is proportionate to the state's legitimate interests in applying the rules and does not arbitrarily exclude material portions of the witness's testimony. (See *id.* at pp. 55-58.) "The State's interest in the orderly

30

conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence." (*Taylor v. Illinois* (1988) 484 U.S. 400, 410-411.)

Gonzalez cites no case holding a trial court violated the right to present a defense based on a routine evidentiary ruling limiting the testimony of a defense witness under Evidence Code section 352 as the trial court here did. We conclude the trial court's ruling served a legitimate purpose under Evidence Code section 352 as set forth above, and the ruling was neither arbitrary nor did it exclude material portions of the witnesses' testimony.

For all the reasons above, this claim is without merit. Gonzalez further argues that cumulative prejudice from this error and the errors asserted in sections II.A through II.D above require reversal. Because we do not conclude above that there were multiple errors, there is no prejudice to cumulate.

## F. Retroactive Application of Senate Bill No. 567

Gonzalez contends we must remand for resentencing under Senate Bill 567 because the trial court imposed twice the upper term for the domestic violence conviction based on aggravating factors that were not found by the jury. The Attorney General concedes Senate Bill 567 applies retroactively but he argues remand would be an idle act because the court based its sentencing decision on Gonzalez's recidivism.

### 1. Background

At the sentencing hearing in 2020, the trial court imposed a 10-year term for the conviction on count 4, equal to the aggravated term of five years doubled for the strike priors. The court found no mitigating circumstances and cited multiple aggravating factors as grounds for imposing the upper term: 1) the crime involved great violence and great bodily harm to the victim (Sharon); 2) based on the probation report, Gonzalez had a history of violent conduct indicating he was a serious danger to society; 3) Gonzalez's prior convictions as an adult, both felony and misdemeanor, were numerous and of

31

increasing seriousness; 4) Gonzalez had served prior prison terms; 5) Gonzalez was on post-release community supervision when he committed the current offense; and 6) Gonzalez performed unsatisfactorily under the prior post-release community supervision.

After Gonzalez was sentenced, Senate Bill 567 amended subdivision (b) of section 1170 to make the middle term presumptive in the absence of certain circumstances, effective January 1, 2022. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038 (*Flores*).) Under subdivision (b)(2) as amended, "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) The amendments to section 1170, subdivision (b) apply retroactively to this case as an ameliorative change in the law that applies to all nonfinal convictions on appeal. (*Flores*, *supra*, 73 Cal.App.5th at p. 1039, citing *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308.)

### 2. *Remand for Resentencing*

The parties agree Senate Bill 567 applies retroactively to this case, but they disagree on whether the application of amended section 1170 requires remand for resentencing. The Attorney General contends no remand is required because the trial court based the imposition of the upper term on Gonzalez's recidivism, and the trial court could properly rely on certified records of the prior convictions demonstrating a history of recidivism. The Attorney General argues that any error was harmless because a jury would have found the aggravating factors beyond a reasonable doubt. (See *People v. Sandoval* (2007) 41 Cal.4th 825, 838-839 [denial of right to jury trial on sentencing factors was subject to harmless error review].) Gonzalez argues that the trial court relied on multiple factors for its sentencing decision, including factors not found by a jury and

not demonstrably harmless beyond a reasonable doubt—e.g., his performance while on post-supervision release. Gonzalez relies on *People v. Wandrey* (2022) 80 Cal.App.5th 962 (*Wandrey*) [remand for resentencing where some degree of speculation would be required to conclude that the jury would have found the aggravating factors and that the trial court would have exercised its sentencing discretion in the same way if it had taken the statutory presumption in favor of the middle term into account].)

The issue of which prejudice standard applies to a reviewing court's determination whether a case should be remanded for resentencing in light of Senate Bill 567 is pending before the California Supreme Court. (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.) We agree with those courts who have held that reviewing courts must consider (1) whether the jury would have found the specified aggravating circumstances; and (2) whether, based on the specific aggravating circumstances that were properly considered, the trial court would have reached the same sentencing determination. (See *People v. Lopez* (2022) 78 Cal.App.5th 459, 465-468; *Wandrey*, *supra*, 80 Cal.App.5th at p. 982; *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1111-1113; *People v. Dunn* (2022) 81 Cal.App.5th 394, 409-410.)

While some of the aggravating factors would have been found beyond a reasonable doubt by a jury, we cannot determine with reasonable probability that a jury would have found all the specified aggravating circumstances and that the trial court would have imposed the same sentence had it considered the aggravating circumstances under current law. Accordingly, we will remand for resentencing under the current version of section 1170, subdivision (b).

## G. Retroactive Application of Assembly Bill No. 518

The trial court imposed a term of 45 years to life for the murder conviction on count 1 and stayed a term of 25 years to life consecutive to five years for the assault conviction on count 2 because both convictions were based on the same criminal act. At the time of the sentencing hearing, section 654 required the sentencing court to punish a

33

defendant convicted for the same act under multiple provisions of law based on the provision of law that provided for the longest potential term of imprisonment. Assembly Bill 518 subsequently amended section 654 to give trial courts the discretion to punish such an act under either provision of law. (*People v. Mani* (2022) 74 Cal.App.5th 343, 350.)

Gonzalez contends we must remand for the trial court to exercise its discretion under the amended version of section 654. The Attorney General concedes the amended version of 654 applies retroactively to this case, but he argues remand would be an idle act because the court clearly indicated its intent to impose a significant sentence. (See *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896 [declining to remand for resentencing where trial court indicated it would not have exercised its discretion to strike allegations].)

Because we are remanding for resentencing based on the retroactive application of Senate Bill 567 as explained in section II.F above, we will allow the trial court to exercise its discretion under Assembly Bill 518 as well. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 [when part of a sentence is stricken on review, "a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances"].)

### H. *Correction of the Abstract of Judgment*

Gonzalez contends the abstract of judgment must be corrected because it erroneously indicates he was convicted of a serious felony on count 4, the domestic violence offense. The Attorney General concedes, and we accept the concession. The abstract of judgment erroneously indicates the conviction under section 273.5, subdivision (f)(1) is a serious felony. Accordingly, we will order the abstracted corrected. "Courts may correct clerical errors at any time, and appellate courts . . . have

34

ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts." (*People v. Mitchell* (2001) 26 Cal.4th 181, 184.)[4]

### III. DISPOSITION

The judgment is reversed and the matter is remanded for resentencing on the grounds set forth above. The trial court shall correct the abstract of judgment to show that the conviction on count 4 did not constitute a conviction for a serious felony.

---

[4] In his opening brief, Gonzalez also challenged the trial court's calculation of prejudgment custody credits at sentencing, but he withdrew this claim in his reply brief, so we do not address it.

_____

Greenwood, P. J.


WE CONCUR:



_____

Grover, J.



_____

Lie, J.



H048636 People v. Gonzalez